NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADP, LLC, <br><br>          Plaintiff, <br><br> V. <br><br> NICOLE RAFFERTY, <br><br>          Defendant. | Civil Action No.: 18-1922 (JLL) <br><br> **OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Plaintiff ADP, LLC's Motion for a Temporary Restraining Order and a Preliminary Injunction against Defendant Nicole Rafferty pursuant to Federal Rule of Civil Procedure 65. (ECF No. 3). The Court has considered the submissions made in support of and in opposition to Plaintiff's motion, as well as the arguments made at the February 22, 2018 hearing, and finds that the Court has sufficient information to rule on the motion for both a temporary restraining order and a preliminary injunction. For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

### I.    BACKGROUND

Plaintiff is a provider of "business outsourcing and software services . . . including human resources, payroll, tax, and benefits administration services." (ECF No. 1 ("Compl.") ¶ 6). Defendant worked for Plaintiff from 2010 until 2017. (Compl. ¶ 9). During the last three years of her employment with Plaintiff, Defendant worked as a "Comprehensive Services Manager"

1

throughout Rhode Island, central and southern Maine, central Massachusetts, and the Greater Boston area.[1] (Compl. ¶ 9). In her capacity as a Comprehensive Services Manager, Defendant "sold business process outsourcing services, which are [Plaintiff's] most strategic and expensive products" to Plaintiff's "highest worth clients." (Compl. ¶ 9).

Throughout Defendant's employment, Plaintiff claims that Defendant received unique specialized training, maintained substantial contact with current and prospective clients, and possessed "confidential, proprietary, and trade secret information." (Compl. ¶¶ 21–23). This information included, but is not limited to, business methods, pricing and marketing strategies, as well as information regarding sales, clients, compensation, and marketing partners. (Compl. ¶ 23). Plaintiff keeps a close guard over its proprietary information and takes steps to ensure that the information is kept secret, *e.g.*, requiring employees to enter into confidentiality and restrictive covenant agreements. (Compl. ¶¶ 24–26).

Defendant signed a Sales Representative Agreement ("SRA") and a Non-Disclosure Agreement ("NDA") when she began working for Plaintiff, which is standard practice for Plaintiff's new employees. (Compl. ¶¶ 10–11). The SRA provided in relevant part that, starting at the time Defendant begins working for Plaintiff and ending one year after she ceases her employment, the

> Employee shall not, on Employee's behalf or on behalf of any other person, . . . or other entity whatsoever (a "Person"), directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client, bona fide prospective client or marketing partner of [Plaintiff] before the date Employee ceases to be an employee of [Plaintiff] (the "Termination Date") that (i) was located in any territory Employee managed or to which Employee was assigned or covered during the two-year period prior to the Termination Date and/or (ii) Employee was assigned, managed and/or had knowledge of, contact or involvement with during the two-year period prior to the Termination Date, to sell license or lease any software, product or service competitive or potentially

---
[1] The Greater Boston area, as referred to here, includes eastern Massachusetts and New Hampshire. (Compl. ¶ 29; Hr'g Tr. at 8:9–17).

2

competitive with any software, product or service sold, licensed, leased, provided or under development by [Plaintiff] during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph *shall only apply* to clients, bona fide prospective clients or marketing partners of businesses of [Plaintiff] *with which the Employee was involved or exposed*.

(ECF No. 1-1 at Ex. A ("SRA"), ¶ 4(a)) (emphasis added). The SRA also restricted Defendant from disclosing "any business methods, procedures, pricing and marketing structure and strategy, programs, forms, confidential information, trade secrets, the names and addresses of current, former clients and prospective clients of [Plaintiff], or other data and information relating to [Plaintiff]" or using or acting upon such information in anyway. (SRA ¶ 4(b)–(c)). Upon her termination or resignation, Defendant was required, under the SRA, to return "all copies of all materials" which belong to Plaintiff that are within her possession. (SRA ¶ 4(b)). The SRA prohibited Defendant from soliciting any of Plaintiff's employees for one year after the date she ceases to be an employee of Plaintiff. (SRA ¶ 4(d)). The SRA also stated that "a violation of the foregoing covenants not to solicit, not to disclose, not to use and not to hire or any provisions thereof will cause irreparable injury to [Plaintiff]." (SRA ¶ 4(e)). The NDA contained substantially similar terms. (*See generally* ECF No. 1-1 at Ex. B ("NDA")).

Plaintiff offers stock awards to certain high performing employees, provided the employee accepts a Restrictive Covenant Agreement ("RCA") with more extensive terms than the SRA and NDA. (Compl. ¶ 16). Defendant accepted a restricted stock award in 2011, 2012, 2013, 2015, 2016, and 2017. (Compl. ¶¶ 18, 20). On each of those occasions, Defendant entered into an RCA with Plaintiff. (Compl. ¶¶ 18, 20). The most recent RCA that Defendant signed was on September 1, 2017 ("2017 RCA"), which stated that Defendant would not "participate in any manner with a Competing Business anywhere in the Territory where doing so [would] require [Defendant] to (i) provide the same or substantially similar services to a Competing Business as those which [she]

provided to [Plaintiff] while employed, or (ii) use, disclose or disseminate [Plaintiff's] Confidential Information or trade secrets." (ECF No. 1-1 at Ex. C ("2017 RCA") ¶ 3). The "Territory" under the RCA is defined as "the geographic area where [Defendant] worked, represented [Plaintiff], or had Material Business Contact with [Plaintiff's] Clients in the two (2) year period preceding the termination of [Defendant's] employment with [Plaintiff]." (2017 RCA ¶ 1(j)). The 2017 RCA also restricted Defendant from soliciting business from "any Client" of Plaintiff or encouraging "any Clients" to cease doing business with Plaintiff for a period of one year after Defendant stops working for Plaintiff. (2017 RCA ¶ 4(a)). The same restrictions applied to "any Business Partner" of Plaintiff. (2017 RCA ¶ 4(b)). The 2017 RCA contained a detailed non-disclosure clause for Plaintiff's confidential information and trade secrets, including any hard copy or electronic material in Defendant's possession. (2017 RCA ¶ 6).

Defendant separated from Plaintiff on December 27, 2017. (Compl. ¶ 28). Soon thereafter, Plaintiff learned that Defendant accepted a position in the Greater Boston area with The Ultimate Software Group, Inc. ("Ultimate"), a direct competitor of Plaintiff. (Compl. ¶ 29). Plaintiff claims that Defendant is selling the same type of product and performing the same or substantially similar job functions for Ultimate as those she did for Plaintiff in the same geographic territory, which is expressly forbidden under the SRA, NDA, and RCAs. (Compl. ¶¶ 31–32). Plaintiff further claims that Defendant "has used or disclosed or will inevitably use and disclose" Plaintiff's proprietary information. (Compl. ¶ 34). Upon learning of Defendant's employment at Ultimate, Plaintiff sent Defendant a letter on December 29, 2017, which outlined her obligations and requested that she provide details regarding her new employment, as required by the 2017 RCA. (Compl. ¶ 35). Defendant did not deny working in the same territory as she did for Plaintiff, but responded that she "'has not and will not solicit business from any of the approximately 30 clients to whom she

successfully sold [Plaintiff's] Comprehensive Services' and '[s]he will not otherwise solicit business from any [of Plaintiff's] clients with whom she dealt.'" (Compl. ¶ 36).

Plaintiff then brought this action on February 9, 2018, alleging (1) Breach of Contract, (2) Breach of Duty of Loyalty, and (3) Unfair Competition. (Compl. ¶¶ 44–67). Plaintiff requests damages, a temporary restraining order, and a preliminary injunction. (Compl. at p. 19–21). Plaintiff seeks to enjoin Defendant from working for Ultimate for a period of twelve months, using or disclosing Plaintiff's confidential proprietary or trade secret information, interfering in any way with Plaintiff's current or prospective clients, or breaching any loyalty obligation she has towards Plaintiff. (Compl. at p. 19–21). Plaintiff also requests that the Court grant a temporary restraining order and a preliminary injunction enjoining Defendant from disposing of any paper or electronic documents relevant to this litigation and ordering Defendant to return any and all confidential, proprietary, or trade mark information or property in her possession. (Compl. at p. 19–21).

## II.    LEGAL STANDARD

Preliminary injunctions are extraordinary remedies that are not routinely granted. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994)). The decision to grant a preliminary injunction is within the sound discretion of the district court. *eBay Inc., et al. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)). In deciding whether injunctive relief should be granted, the Court must determine (i) that the movant has a reasonable likelihood of success on the merits, (ii) that the denial of injunctive relief will result in irreparable harm to the movant, (iii) that granting injunctive relief for the movant will not result in even greater harm to the non- movant; and (iv) that the public interest favors granting the preliminary injunction. *Kos Pharm.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)).

The movant bears the burden of demonstrating that the injunction it seeks should issue. *Id.* To obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success and the probability of irreparable harm if relief is not granted. *Morton v. Beyer*, 822 F. 2d 364, 367 (3d Cir. 1987) (quotations omitted); *see also In re Arthur Teacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) ("[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.")

### III. ANALYSIS

Based on the following analysis, the Court grants Plaintiff a preliminary injunction enjoining Defendant from violating the terms and conditions of the SRA and NDA by soliciting Plaintiff's clients (as defined in those agreements) or using or disclosing any of Plaintiff's confidential or proprietary information. However, the Court will not enjoin Defendant from working for Ultimate or soliciting Plaintiff's clients that are generally not covered by the SRA and NDA. This is because Plaintiff can only show a likelihood of success on the merits for its claims pertaining to the SRA and NDA, and not for its claims pertaining to the RCAs.

**A. Likelihood of Success on the Merits**

To grant a preliminary injunction, the movant must first show a reasonable likelihood of success on the merits. *Kos Pharm.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc.*, 171 F.3d at 158). As explained above, the agreements at issue here are the SRA, NDA, and RCAs. (*See supra* Part I). An agreement that restricts an employee's ability to compete with her employer after the employee's termination or resignation will generally be found to be reasonable, and thus enforceable, "where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 576 (1970).

Plaintiff has not shown that its claims regarding the RCAs are likely to succeed on the merits. The parties dispute whether there is a legitimate interest for the RCAs, because they protect against the same harm already covered by the SRA and NDA, *i.e.*, divulging trade secrets, doing damage to Plaintiff's good will, or soliciting Plaintiff's clients. (ECF No. 9 at 16; ECF No. 17 at 6). Another case in this District considered the validity of similar stock-option non-competes and applied New Jersey law to find that the agreements did not have a legitimate purpose. *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 762–63 (D.N.J. 1998). The Court in *Laidlaw* based its decision on the fact that the employees of the plaintiff were not required to sign the stock-option non-competes in order to obtain employment, confidential information, or access to clients. *Id.* at 763. Similarly in this case, Plaintiff does not require its employees to enter into the RCAs and does not even offer the RCAs to all of its employees, (Compl. ¶ 16), which is further evidence that the purpose behind the RCAs is not to protect Plaintiff's legitimate interests but rather to decrease competition.

The RCAs may also impose an undue hardship on Defendant. Plaintiff argues that the RCAs do not impose an undue hardship because they are limited to the geographic territory where Defendant worked for Plaintiff and are only in effect for one year. (ECF No. 3-2 at 17). However, the Court is not convinced by this argument, because the RCAs apply broadly to *all* of Plaintiff's current or prospective clients regardless of whether Defendant had contact with those clients, (2017 RCA ¶ 4(a)). *See Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 298 (Law Div. 1995) (holding that a restrictive covenant was overbroad to the extent that it covered prospective clients that only the plaintiff had solicited, not the defendant).

The Court is also not convinced of the success, or lack thereof, of the argument that the RCAs are unreasonable restraints on trade under collateral estoppel, which was discussed in the

parties' briefs and at oral argument. (ECF No. 9 at 22–31; ECF No. 17 at 7–10; Hr'g Tr. at 24:1–26:3, 47:19–48:11; ECF No. 19). The fact that there are decisions both upholding and rejecting the RCAs does not make it any more likely that Plaintiff shall succeed on the merits, which is all the Court is currently considering. Though the RCAs may be found to be enforceable at trial, Plaintiff has not set forth sufficient evidence to carry its burden at this juncture. *See Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.") (citing *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980)). Accordingly, in the absence of a likelihood of success on the merits, Defendant cannot be enjoined from working for Ultimate as the RCAs may require or from soliciting Plaintiff's clients as that term is defined in the RCAs.

However, Plaintiff has shown that its claims regarding the SRA and NDA are likely to succeed on the merits. The SRA and NDA are intended to protect Plaintiff's confidential and proprietary information and client relationships, (Compl. ¶¶ 11, 26), which qualify as legitimate employer interests. *HR Staffing Consultants, LLC v. Butts*, Civ. No. 2:15-3155, 2015 WL 3492609, at *8 (D.N.J. May 29, 2015) (citing *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999)). The SRA and NDA are also narrowly tailored to clients that Defendant dealt with or was exposed to. (SRA ¶ 4(a); NDA ¶ 3(b)). Moreover, Defendant acknowledged at the hearing that the SRA and NDA are enforceable against her. (Hr'g Tr. at 41:10–21). Therefore, Plaintiff meets the first element for a preliminary injunction enjoining Defendant from violating the SRA and NDA. The Court will continue to analyze Plaintiff's motion as it pertains to these two agreements, but not as it pertains to the RCAs.

## B. Irreparable Harm

The second element for a preliminary injunction is that the denial of injunctive relief will result in irreparable harm to the movant. *Kos Pharm.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc.*, 171 F.3d at 158). To warrant the issuance of an injunction, a plaintiff must establish more than a *risk* of irreparable injury, but rather must demonstrate a "clear showing of *immediate* irreparable injury." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990) (quoting *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)) (emphasis added). Plaintiff claims that the irreparable harm it will suffer is the loss of current and prospective clients, confidential and proprietary information, and its reputation or "good will." (Compl. ¶ 38; ECF No. 3-2 at 19–21).

The Court is not convinced that the loss of current and prospective clients is an irreparable harm, considering any loss of clients can be remedied through money damages. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) ("In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial."). The amount that Plaintiff is entitled to recover can be quantified through discovery. For example, discovery can reveal how many products would have been sold, and how much money Plaintiff lost. Therefore, the Court does not find the loss of clients to be an irreparable harm.

However, the Third Circuit recognizes the loss of good will as an irreparable harm. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)). It is true that Defendant's solicitation of Plaintiff's clients would harm Plaintiff's good will, as clients would "likely view any 'defection' of employees to a competitor in a negative light." *ADP, LLC v. Jacobs*, Civil

Action No. 2:15-3710 (JLL)(JAD), 2015 WL 4670805, at *7 (D.N.J. Aug. 5, 2015). Ultimate's solicitation of Plaintiff's clients is ongoing, (Hr'g Tr. at 29:22–30:4), necessitating a preliminary injunction. *Jacobs*, 2015 WL 4670805, at *7.

Furthermore, the disclosure of confidential and proprietary information is also recognized as an irreparable harm. *Laidlaw, Inc.*, 20 F. Supp. 2d at 766. Plaintiff alleges that Defendant possessed business methods, pricing and marketing strategies, as well as other confidential and proprietary information which will directly aid Ultimate at Plaintiff's detriment. (ECF No. 3-2 at 20). Plaintiff further alleges that Defendant's disclosure of this information is inevitable. (Compl. ¶ 34). The harms associated with the loss of good will and proprietary and confidential information would be prevented by enjoining Defendant from violating the SRA and NDA. (*See* SRA ¶ 4 (restricting Defendant from soliciting clients or divulging confidential or proprietary information); NDA ¶¶ 1–3 (same)). Therefore, the Court finds that Plaintiff has met the second element for a preliminary injunction.

### C. Balance of the Interests

To meet the third factor, the granting of injunctive relief for the movant must not result in even greater harm to the non-movant. *Kos Pharm.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc.*, 171 F.3d at 158). While the Court is satisfied that Defendant should be enjoined from soliciting Plaintiff's clients, using or disclosing its proprietary information, and violating any other terms under the SRA and NDA, it will not go so far as to enjoin Defendant from working for Ultimate. By enjoining Defendant from soliciting Plaintiff's clients that Defendant was involved with or exposed to, as well as enjoining her from disclosing confidential or proprietary information, the Court will accomplish the objective of the SRA and NDA, which is to prevent harm to Plaintiff's business caused by the loss of clients, information, and good will. (Compl. ¶¶ 11, 26). The SRA

11, 26). The SRA and NDA do not restrict Defendant from being employed by a competitor. (*See generally* SRA; NDA). Requiring Defendant to quit her job would clearly result in significant harm to her and would be unnecessary in light of the fact that the harm to Plaintiff envisioned in the SRA and NDA can be avoided by less restrictive means, *i.e.*, this preliminary injunction. The restraints imposed by the SRA and NDA are presumptively reasonable considering Defendant concedes that they are enforceable against her. (Hr'g Tr. at 41:10–21). Therefore, the Court's decision to enjoin Defendant from soliciting Plaintiff's clients as that term is defined in the SRA and NDA and from using or disclosing Plaintiff's proprietary information, but not to enjoin her from working at Ultimate, strikes a balance between the parties' interests while producing a result that will minimize the overall harm to both parties.

### D. Public Interest

Although this matter is a private dispute between private parties, the Court nevertheless finds that issuance of an injunction is in the public interest in certain ways. *See Score Bd., Inc. v. Upper Deck Co.*, 959 F.Supp. 234, 240 (D.N.J.1997) (stating that an injunction is in the public interest where "[i]t will prevent one company from interfering with the legally protected contractual rights of another."). If the SRA and NDA are not enforced in some regard, then the entire purpose of the agreements is undermined. This Court has previously held, and remains cognizant of the fact, that "[j]udicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 684 (D.N.J. 1999) (citing *AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993)). Though there is a public interest in free competition, it is outweighed by the public interest in upholding some form of the agreements. *Barmasters Bartending Sch., Inc. v. Authentic*

*Bartending Sch., Inc.*, 931 F. Supp. 377, 387 (E.D. Pa. 1996). Therefore, the Court finds that granting a preliminary injunction against Defendant is in the public interest.

### IV. CONCLUSION

For the aforementioned reasons, Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction is hereby granted in part and denied in part. Specifically, Plaintiff's Motion for a Temporary Restraining Order is denied. Plaintiff's Motion for a Preliminary Injunction is granted, except Defendant is not enjoined from working for Ultimate or soliciting Plaintiff's clients generally not covered by the SRA and NDA. An appropriate Order follows this Opinion.

Date: April 2nd, 2018

JOSE L. LINARES
Chief Judge, United States District Court